IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | | |
|---|---|---|---|
| DARRYL GATLIN, | ) | | |
| | ) | | |
| Plaintiff, | ) | CIVIL ACTION NO. | |
| | ) | 1:12-CV-0953-AT | |
| v. | ) | | |
| | ) | **JURY TRIAL DEMANDED** | |
| (1) CITIMORTGAGE, INC.; | ) | | |
| (2) CITIBANK, N.A., as trustee for the | ) | | |
| STRUCTURED ASSET SECURITIES | ) | | |
| CORPORATION MORTGAGE | ) | | |
| PASS-THROUGH CERTIFICATES, | ) | | |
| SERIES 2003-36XS; | ) | | |
| (3) WILMINGTON TRUST COMPANY, | ) | | |
| as trustee for the STRUCTURED ASSET | ) | | |
| SECURITIES CORPORATION | ) | | |
| MORTGAGE PASS-THROUGH | ) | | |
| CERTIFICATES, SERIES 2003-36XS; | ) | | |
| (4) PENDERGAST & ASSOCIATES, P.C.; | ) | | |
| (5) STRUCTURED ASSET SECURITIES | ) | | |
| CORPORATION MORTGAGE | ) | | |
| PASS-THROUGH CERTIFICATES, | ) | | |
| SERIES 2003-36XS; | ) | | |
| (6) AURORA LOAN SERVICES, INC. nka | ) | | |
| AURORA LOAN SERVICES, LLC; | ) | | |
| (7) LEHMAN BROTHERS HOLDINGS, | ) | | |
| INC.; | ) | | |
| (8) STUCTURED ASSET SECURITIES | ) | | |
| CORPORATION; | ) | | |
| (9) MORTGAGE ELECTRONIC | ) | | |
| REGISTRATION SYSTEMS, INC.; | ) | | |
| (10) MBIA INSURANCE CORPORATION; | ) | | |
| and | ) | | |
| (11) SUNTRUST BANK sbm NATIONAL | ) | | |
| BANK OF COMMERCE, formerly doing | ) | | |
| business as BANCFINANCIAL SERVICES | ) | | |
| | ) | | |

1

Defendants.                                    )
_____ )

## PLAINTIFF'S FIRST AMENDED COMPLAINT & PETITION FOR EQUITABLE RELIEF

COMES NOW, Plaintiff Darryl Gatlin, by and through his undersigned counsel of record, and files this his First Amended Complaint & Petition for Equitable Relief (hereinafter, "Amended Complaint"), wherein he alleges as follows:

## NATURE OF ACTION

1.

This Action concerns the foreclosure of Mr. Gatlin's home located at 8138 Mountain Pass, Riverdale, Clayton County, Georgia 30274 (hereinafter, the "Property"), being more particularly described as follows:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 236 OF THE 13TH DISTRICT OF CLAYTON COUNTY, GEORGIA, AND BEING LOT 35, BLOCK A, SANDPIPER GLEN SUBDIVISION, UNIT FOUR, AS PER PLAT RECORDED IN PLAT BOOK 29, PAGE 164, CLAYTON COUNTY, GEORGIA RECORDS, TO WHICH REFERENCE IS HEREBY MADE FOR A MORE PARTICULAR DESCRIPTION OF SAID PROPERTY.

## PARTIES, JURSIDICTION, AND VENUE

2.

This Court has original jurisdiction over Plaintiff's Fourth and Fifth causes of Action pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over all other Causes of Action pursuant to 28 U.S.C. § 1367(a), because these Causes of Action

are so related to the Causes of Action within the Court's original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." 28. U.S.C. § 1367(a).

3.

At all times relevant to this Action, Plaintiff has been a resident of Clayton County, Georgia.

3.

Defendant CitiMortgage, Inc. (hereinafter,"CMI") is a for-profit corporation incorporated in New York. At all times relevant to this Action, CMI claimed to be the servicer of the Mortgage Loan at issue in this Action. CMI maintains regular and systematic contacts with the State of Georgia and with the County of Clayton through the servicing of residential mortgage loans encumbering residences located in Clayton County, Georgia (among other activities). Thus, jurisdiction is proper as to CMI. CMI may be served with this Amended Complaint through its counsel of record pursuant to Fed R. Civ. P. 5(b)(1), (b)(2)(E).

4.

Defendant Citibank, N.A. (hereinafter, "Citibank") is being sued in its representative capacity as former trustee of Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-36XS. Citibank is a nationally-chartered bank headquartered in South Dakota. CMI is a wholly-owned subsidiary

of Citibank. Citibank maintains regular and systematic contacts with the State of Georgia and with the County of Clayton through banking and investing activities (including lending). Thus, jurisdiction is proper as to Citibank. Citibank may be served with this Amended Complaint through its counsel of record pursuant to Fed R. Civ. P. 5(b)(1), (b)(2)(E).

5.

Defendant Wilmington Trust Company (hereinafter, "Wilmington" or "Wilmington as Trustee") is being sued in its representative capacity as trustee of Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-36XS. Wilmington is a for-profit corporation incorporated in Delaware. Wilmington maintains minimum contacts with the State of Georgia and the County of Clayton through various business activities including investing in real property in Clayton County. Wilmington as Trustee is the current owner of record of the Property. Thus, jurisdiction as to Wilmington is proper. Wilmington may be served with this Amended Complaint through its counsel of record pursuant to Fed R. Civ. P. 5(b)(1), (b)(2)(E).

6.

Defendant Pendergast & Associates, P.C. (hereinafter, "Pendrgast") is a for-profit corporation incorporated in Georgia and with a principal place of business in Georgia. Pendergast is a foreclosure law firm that maintains regular and systematic

contacts with the state of Georgia and the County of Clayton. Thus, jurisdiction as to Pendergast is proper. Pendergast may be served pursuant to Fed. R. Civ. P. 4 through its registered agent, John F. Pendergast, Jr., at 115 Perimeter Center Place, Suite 1000, Atlanta, GA 30346.

7.

Defendant Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-36XS (hereinafter, the "Trust") is a for-profit corporation incorporated in Delaware with a principal place of business in New York. The Trust maintains minimum contacts with the State of Georgia and the County of Clayton. Thus, jurisdiction as to the Trust is proper herein. The Trust is being sued because it is the purported owner and holder of Plaintiff's Note. Barring the discovery of additional information, the Trust is only being sued under one Cause of Action (declaratory judgment). The Trust may be served pursuant to Fed. R. Civ. P. 4(e)(1)(C) by delivering a copy of the summons and amended complaint to its registered agent, Wilmington Trust Company, at Rodney Square North, 1100 North Market Street, Wilmington, DE 19890.

8.

Defendant Aurora Loan Services, Inc. nka Aurora Loan Servicing, LLC (hereinafter, "Aurora") is a for-profit corporation incorporated in Delaware. Pursuant to the Trust documents on file with the SEC, Aurora is the Master

Servicer of the Trust. Aurora maintains regular and systematic contacts with the State of Georgia and the County of Clayton through the servicing of mortgage loans encumbering properties located in Clayton. Thus, jurisdiction as to Aurora is proper herein. Aurora is being sued because there are certain provisions within the Trust Agreement that require Aurora to purchase Notes from the Trust. Barring the discovery of additional information, Aurora is only being sued under one Cause of Action (declaratory judgment). Aurora may be served through its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, GA 30092.

9.

Defendant Lehman Brothers Holdings, Inc. (hereinafter, "LBH") is a for-profit corporation incorporated in Delaware with a principal place of business in New York. Pursuant to the Trust documents on file with the SEC, LBH purportedly was the original purchaser of the Mortgage Notes (including Plaintiff's Note) that were eventually transferred into the Trust. LBH is the purported Seller of Plaintiff's Note to Structured Asset Securities Corporation (hereinafter, "SASC"), and is the purported underwriter of the asset-backed securities collateralized by the Trust corpus.  LBH maintains minimum contacts with the State of Georgia and the County of Clayton. Thus, jurisdiction is proper as to LBH. Barring the discovery of additional information, LBH is only being sued on one

6

Cause of Action (declaratory judgment). LBH may be served through its registered agent, Corporation Service Company, at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

10.

Defendant Structured Asset Securities Corporation ("SASC") is a for-profit corporation incorporated in Delaware with a principal place of business in New York. Pursuant to the Trust documents on file with the SEC, SASC purchased the Mortgage Notes from LBH and was the Depositor of the Mortgage Notes into the Trust. SASC maintains minimum contacts with the State of Georgia and the County of Clayton through business and investment activities. Thus, jurisdiction is proper as to SASC. Barring the discovery of additional information, SASC is only being sued on one Cause of Action (declaratory judgment). SASC may be served through its registered agent, Corporation Service Company, at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

11.

Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter, "MERS") is a for-profit corporation with its principal place of business in Virginia. MERS was the grantee on Plaintiff's Security Deed and the purported transferor of the Security Deed to CMI. MERS maintains regular and systematic contacts with the State of Georgia and the County of Clayton. Thus, jurisdiction and venue are

proper as to MERS. MERS may be served through its President & CEO—William (Bill) Beckmann, its Treasurer—Juanita W. Russell, or its Secretary—Sharon M. Horstkamp, at 1818 Library Street, Suite 300, Reston, VA 20190.

12.

Defendant MBIA Insurance Corporation ("MBIA") is a for-profit corporation incorporated in New York that is a wholly-owned subsidiary of MBIA, Inc. MBIA is the Insurer of the Trust. MBIA is being sued because the Insurance Agreement for the Trust that is on file with the SEC gives MBIA a right of subrogation in Trust property to the extent of any payments made under the Insurance Agreement. Barring the discovery of additional information, MBIA is only being sued on one Cause of Action (declaratory judgment). MBIA maintains minimum contacts with the State of Georgia and the County of Fulton through various business activities, including the insuring of notes collateralized by real property in Clayton County. Thus, jurisdiction is proper herein as to MBIA. MBIA may be served through its CEO (Gary C. Dunton), its Chief Financial Officer (C. Edward Chaplin), or one of its three Managing Directors (Martin A. Braunstein, Carol K. Blai, or Dina E. Bellis), at its headquarters located on 113 King Street, Armonk, NY 10504.

13.

Defendant Suntrust Bank ("Suntrust"), successor by merger to National Bank of Commerce ("NBC"), formerly doing business as BancFinancial Services ("BancFinancial"), is a Georgia corporation. Suntrust is being sued because "BancFinancial Services a division of National Bank of Commerce" is named as the lender on Plaintiff's Security Deed. Barring the discovery of additional information, Suntrust is only being sued on one Cause of Action (declaratory judgment). Suntrust maintains regular and systematic contacts with the State of Georgia and the County of Clayton. Thus, jurisdiction as to Suntrust is proper herein. Suntrust may be served through its registered agent, Raymond D. Fortin, at 303 Peachtree Street N.E., Suite 3600, c/o Hasana R. Kelly, Atlanta, GA 30308.

14.

Venue is proper herein pursuant to 28 U.S.C. § 1391(b)(2), because the Property that is the subject of this Action is located in Clayton County, Georgia.

## GENERAL FACTS RELEVANT TO ALL CAUSES OF ACTION

15.

Mr. Gatlin obtained title to the Property via Warranty Deed executed on April 11, 2003, and recorded on April 17, 2003 at Deed Book 6433, Page 38, Clayton County, Georgia records.

16.

Also on April 11, 2003, and as evidence of the indebtedness incurred by virtue of a loan that Mr. Gatlin obtained to purchase the Property (the "Loan"), Mr. Gatlin executed a promissory note in favor of BancFinancial Services a division of National Bank of Commerce ("BancFinancial") (the "Note").

17.

Also on the same day, Mr. Gatlin executed a Security Deed in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for BancFinancial, which Security Deed was recorded April 17, 2003, at Book 6433, Page 39, Clayton County, Georgia records. The Security Deed is attached hereto as **Exhibit "A"** and is incorporated herein by reference.

18.

That Security Deed was purportedly assigned from MERS to CitiMortgage, Inc. ("CMI") on January 6, 2010 via that assignment recorded January 8, 2010 at Deed Book 9758, Page 385, Clayton County Georgia records (the "Assignment"). The Assignment is attached hereto as **Exhibit "B"** and is incorporated herein by this reference.

19.

Mr. Gatlin's home was foreclosed on February 7, 2012 by CMI. A Deed Under Power of Sale ("DUP) purportedly conveying the Property from CMI to Wilmington Trust Company ("Wilmington") as Trustee for the Structured Asset

Securities Corporation Mortgage Pass-Through Certificates, Series 2003-36XS (the "Trust") was recorded on March 9, 2012, at Deed Book 10085, Page 94, Clayton County, Georgia records. The DUP is attached hereto as **Exhibit "C"** and is incorporated herein by this reference.

20.

Plaintiff had been making payments to CMI since at least 2006. However, Plaintiff came to believe that his Note and Security Deed were owned and/or held by separate entities (i.e., that they had been "split"); and, as Plaintiff lives in an area that had been decimated by mortgage fraud, he wanted to ensure that he was making payments to the proper party so that he would not also fall victim.

21.

Thus, prior to Plaintiff's home being foreclosed on and prior to the Assignment from MERS to CMI being recorded, Plaintiff contacted CMI several times (1) to determine who owned Plaintiff's Note, (2) to verify that CMI was authorized to act as servicer and to collect payments on behalf of the Note owner, and (3) to obtain verification from the Note owner that Plaintiff's payments were being properly applied to his account.

22.

CMI initially represented to Plaintiff that it owned his Note and held his Security Deed. However, after persistent requests from Plaintiff, CMI eventually

11

admitted to Plaintiff that it did not own his Note and was merely the servicer, but would not tell Plaintiff who owned his Note.

23.

After being consistently stonewalled by CMI, Plaintiff attempted to take matters into his own hands. In September of 2009, Plaintiff attempted to rescind the authority of the Security Deed's grantee and its successors and assigns from acting as his power of attorney in enforcing any of the terms of the Security Deed by virtue of two documents—one entitled "Notice of Removal" and the other entitled "Notice of Revocation of Power of Attorney & Revocation of Signature Affidavit" (hereinafter collectively, "Revocations of Power of Attorney" or "Revocations"). (See Dkt. [16-2], [16-3] ).

24.

That same month (September of 2009), Plaintiff sent a Qualified Written Request ("QWR") to BancFinancial and MERS (the original payee on the Note and the original grantee on the Security Deed) wherein he specifically requested a copy of his Note along with "all assignments, transfers, alone[s], or other document[s] evidencing a transfer, sale, or assignment" of the Note to another entity. (See Dkt. [16-4] at 7 ¶ 11). He also requested a full payment history. (See Dkt. [16-4] at 8).

25.

Plaintiff also sent this QWR to CMI. When Plaintiff did not receive a response from any party, he contacted CMI to determine why no response was given, whereupon he was told that none was required given that his Loan was not a "federally related mortgage."

26.

Finally, in November of 2009, Plaintiff attempted to cancel the Security Deed and convey the Property to the "DVG Family Revocable Living Trust" by virtue of documents entitled "Full Reconveyance" and "Revised Warranty Deed." (See Dkt. [16-5] and Dkt. [16-6]).

27.

The documents appearing in the record as Dkt. [16-2] through Dkt. [16-6] were recorded in the real property records of Clayton County before the Assignment from MERS to CMI was recorded.

28.

None of these actions elicited a significant response from CMI. Therefore, as Plaintiff could not be sure whether his payments were being properly applied to his account without the true Note owner stating as much to Plaintiff, and as Plaintiff could not know whether CMI was entitled to act as servicer without the true Note owner stating as much, Plaintiff began withholding payments in an effort to force

CMI to disclose the identity of the true Note owner. In response, CMI continued to hide the identity of the true Note owner and commenced foreclosure proceedings.

29.

After being foreclosed on but prior to filing this Action, Plaintiff obtained a "Securitization Analysis Report" (hereinafter, "SAR") revealing that his Note had been transferred into the Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-36XS (the "Trust"). The SAR also revealed that the Trust closed on or about October 30, 2003.

30.

The Trust Agreement, which is of public record on the SEC's website, reaffirms that the Trust closed **on** October 30, 2003.[1] (See Trust Agreement (attached hereto as **Exhibit "D"**), p. 29). The Trust Agreement further states that it is dated "as of October 1, 2003", that the Depositor (Structured Asset Securities Corporation) was the owner of the "Mortgage Loans"[2] at the Closing Date, and that the Depositor was conveying the Mortgage Loans to the Trustee (which at that time was Citibank, N.A.) as of October 1, 2003 by virtue of the Trust Agreement.

---

[1] http://www.sec.gov/Archives/edgar/data/1268741/000116231803000519/m20543trustagreement.htm.

[2] "Mortgage Loan: A Mortgage and the related notes or other evidences of indebtedness secured by each such Mortgage conveyed, transferred, sold, assigned to or deposited with the Trustee pursuant to Section 2.01 or Section 2.05…" Trust Agreement, Art. I, §1.01 (Definitions) (**Ex. "D"** p. 41).
http://www.sec.gov/Archives/edgar/data/1268741/000116231803000519/m20543trustagreement.htm

(**Ex. "D"**, pp. 11-12). In other words, matters of public record indicate that the Trust likely became the purported owner of Plaintiff's Note in 2003.

31.

Additionally, none of the Trust documents on file with the SEC indicate that CMI was to serve as servicer for any of the loans in the Trust. Rather, Aurora Loan Services, Inc. (nka Aurora Loan Services, LLC) ("Aurora"), Greenpoint Mortgage Funding, Inc. ("Greenpoint"), and SIB Mortgage ("SIB"), (collectively, the "Servicers") were to function as the "primary servicers" for the loans owned by the Trust according to the Trust Prospectus Supplement (with Aurora also functioning as "Master Servicer"). (See Dkt. [1-4] at 80). Therefore, Plaintiff was justified in doubting whether CitiMortgage was authorized to act as servicer for his Note.

32.

All of the Trust documents on file with the SEC name Citibank as the Trustee. However, the Trust has not filed anything with the SEC since March of 2004. Wilmington apparently became the Trustee at some unknown time after this final filing was made; therefore the change in servicer was not a matter of public record and Plaintiff was not aware of it.

33.

15

However, Wilmington was the Trustee for the Trust on the day the foreclosure sale took place. (See **Ex. "C"**).


## FIRST CAUSE OF ACTION: WRONGFUL FORECLOSURE
(As to Defendants Wilmington, CMI, and Pendergast)

34.

CMI exercised the power of sale provision contained in Section 22 of Plaintiff Security Deed on February 7, 2012, when it non-judicially foreclosed on the Property.

35.

As the exerciser of the power of sale, CMI was under a duty to exercise the power of sale fairly and in good faith pursuant to O.C.G.A. § 23-2-114. For the reasons noted below, CMI engaged in wrongful conduct that constituted the breach of this duty.

36.

CMI was acting as Wilmington's agent in exercising the power of sale. Wilmington directed and controlled and/or ratified all of CMI's wrongful conduct. Thus, Wilmington is jointly liable for CMI's wrongful conduct.

37.

Pendergast, as agent for CMI and as subagent for Wilmington, was the entity that actually exercised the power of sale by commencing foreclosure proceedings

and crying the foreclosure sale. Pendergast is jointly liable for all of CMI's wrongful conduct because it aided CMI in the commission of the wrongful conduct, and actually committed some or all of the wrongful conduct on behalf of CMI.

## WRONGFUL ACT #1: FIRST VIOLATION OF O.C.G.A. § 44-14-162.2(a)

38.

Pendergast sent a Notice of Sale Under Power to Plaintiff. The Notice of Sale was attached as an exhibit to the DUP and was recorded in the Clayton County real estate records. (See **Exhibit "C"**).

39.

Pursuant to O.C.G.A. § 44-14-162.2(a), the Notice of Sale must be given to the debtor "by the secured creditor." In other words, the Notice of Sale must clearly identify the secured creditor, and must state that the Notice of Sale (if sent by an agent) is being sent on behalf of the secured creditor.

40.

Pursuant to controlling Georgia law, the "secured creditor" is the **owner** of the Loan obligation, i.e. the **owner** of the beneficial interest in the Note. It is not merely a party entitled to enforce the Note (including, but not limited to, the holder of the Note) pursuant to O.C.G.A. § 11-3-301, nor is it merely the servicer of the Note.

41.

At the time the Notice of Sale was sent to Plaintiff, CMI was not the owner of the Note. Rather, assuming *arguendo* that (1) the Note was actually transferred into the Trust, and (2) the Note was *properly* transferred into the Trust, Wilmington as Trustee was the owner of the Note.

42.

CMI's failure to clearly state the name of the owner of the Note on the Notice of Sale constituted wrongful conduct and was a breach of the duty to exercise the power of sale fairly and in good faith.

**WRONGFUL ACT #2: SECOND VIOLATION OF O.C.G.A. § 44-14-162.2(a)**

43.

Pursuant to O.C.G.A. § 44-14-162.2(a), the Notice of Sale "shall include the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor."

44.

The Notice of Sale lists CMI as the entity with "full authority to negotiate, amend, and modify all terms of the mortgage with the debtor."

45.

CMI was not, at any time, the entity with "full authority to negotiate, amend, and modify all terms of the mortgage with the debtor."

46.

Assuming *arguendo* that that (1) the Note was actually transferred into the Trust, and (2) the Note was *properly* transferred into the Trust, Wilmington as Trustee was the entity with "full authority to negotiate, amend, and modify all terms of the mortgage with the debtor" at the time the Notice of Sale was sent.

47.

Additionally, even assuming *arguendo* that a servicer of the Trust was the entity with "full authority to negotiate, amend, and modify all terms of the mortgage with the debtor," CMI would never qualify as the "entity with authority" because, pursuant to the Trust documents on file with the SEC, CMI was not a servicer of the Trust at any time.

48.

CMI's failure to state the name of the entity that *truly* had "full authority to negotiate, amend, and modify all terms of the mortgage with the debtor" constituted wrongful conduct and was a breach of the duty to exercise the power of sale fairly and in good faith.

## WRONGFUL ACT #3: THIRD VIOLATION OF O.C.G.A. § 44-14-162.2(a)

49.

Pursuant to O.C.G.A. § 44-14-162.2(a), the Notice of Sale "shall be sent by registered or certified mail or statutory overnight delivery, return receipt requested, to the property address or to such other address as the debtor may designate by written notice to the secured creditor."

50.

The Notice of Sale was not "sent by registered or certified mail or statutory overnight delivery, return receipt requested."

51.

CMI's failure to send the Notice of sale in the manner prescribed by the statute constituted wrongful conduct and was a breach of the duty to exercise the power of sale fairly and in good faith.

**WRONGFUL ACT #4: VIOLATION OF O.C.G.A. § 44-14-162(b)**

52.

Pursuant to O.C.G.A. § 44-14-162(b), "[t]he security instrument or assignment thereof vesting the **secured creditor** with title to the security instrument shall be filed prior to the time of sale in the office of the clerk of the superior court of the county in which the real property is located." (Emphasis added.)

53.

Pursuant to controlling Georgia law, the "secured creditor" is the **owner** of the Loan obligation, i.e. the **owner** of the beneficial interest in the Note. It is not merely a party entitled to enforce the Note (including, but not limited to, the holder of the Note) pursuant to O.C.G.A. § 11-3-301, nor is it merely the servicer of the Note.

54.

At the time of foreclosure, CMI was vested with title to the Security Deed. However, CMI was not the owner of the Note. Rather, assuming *arguendo* that (1) the Note was actually transferred into the Trust, and (2) the Note was *properly* transferred into the Trust, Wilmington as Trustee was the owner of the Note.

55.

CMI's failure to transfer the Security Deed into the name of the owner of the Note prior to foreclosure sale constituted wrongful conduct and was a breach of the duty to exercise the power of sale fairly and in good faith.

## WRONGFUL ACT #5: INVALID/FRAUDULENT ASSIGNMENT & DUP

56.

As a privy in law, in fact, and/or in estate, Plaintiff has standing to challenge the validity of the Assignment and the DUP.

57.

Even assuming *arguendo* that CMI was the "secured creditor," it would not have standing to foreclose if the document vesting it with title (the Assignment) was invalid or fraudulent.

58.

The Assignment is fraudulent and invalid because it contains several patently false statements.

59.

First, the Assignment is fraudulent and invalid because it purports to have been executed in Franklin County, MO, when it was actually executed in St. Charles County, MO.

60.

Second, the Assignment is fraudulent and invalid because it purports to sell the entire indebtedness (i.e. the beneficial interest in Plaintiff's Note) "for value received" to CMI by virtue of the Assignment, when in fact CMI never purchased a beneficial interest in Plaintiff's Note.

61.

Third, the Assignment is fraudulent and invalid because it purports to sell the entire indebtedness (i.e. the beneficial interest in Plaintiff's Note) "for value received" to CMI by virtue of the Assignment, when MERS never owned a

beneficial interest in Plaintiff's Note and consequently could not have sold a beneficial interest in Plaintiff's Note.

62.

Fourth, the Assignment is fraudulent and invalid because it claims that Aaron Menne is a Vice President of MERS and that Jaime Hardcastle is a Vice President of MERS, when in fact Menne and Hardcastle are employees of CMI.

63.

Fifth, the Assignment is fraudulent and invalid because Menne and Hardcastle did not have written authorization from MERS to sign documents as Vice Presidents of MERS prior to the execution of the Assignment. Assuming *arguendo* that they did have such written authorization, such authorization constituted the fraudulent bestowal of false authority, because it allowed Menne and Hardcastle to falsely assert that they were officers of MERS when they were not in fact.

64.

Sixth, the Assignment is fraudulent and invalid because MERS did not have explicit written authorization from BancFinancial to transfer the Security Deed. Assuming *arguendo* that MERS did have such explicit written authorization, such authorization was not legally sufficient because it did not comply with the "equal dignities rule" and the Statute of Frauds.

65.

Seventh, the Assignment is fraudulent and invalid because it was improperly and fraudulently attested. The Assignment was improperly and fraudulently attested because the Unofficial Witness (Ashocki Manahan) and/or the Notary Public (Tonya Graham) did not personally witness both Menne and Hardcastle execute the Assignment. Nonetheless, Manahan and Graham knowingly and falsely asserted on the Assignment (by virtue of attestation) that they personally witnessed both Menne and Hardcastle execute the Assignment. Additionally, the DUP was improperly and fraudulently attested in the same manner and is invalid on that basis as well.

66.

For some or all of the foregoing seven reasons, the Assignment vesting CMI with title to the Security Deed was fraudulent or invalid, and CMI consequently was not vested with title to the Security Deed. Thus, CMI did not have standing to foreclose.

67.

CMI's act of foreclosing in its own name when it did not have standing to foreclose constituted wrongful conduct and was a breach of the duty to exercise the power of sale fairly and in good faith.

**WRONGFUL ACT #7: BREACH OF SECTION 22 OF SECURITY DEED**

68.

CMI purported to be in privity of contract with Plaintiff by virtue of the transfer of the Security Deed via Assignment.

69.

As the purported assignee of the Security Deed, CMI had contractual obligations that it owed to Plaintiff by virtue of the Security Deed.

70.

Pursuant to Section 22 of the Security Deed, CMI was required to give Plaintiff a notice prior to accelerating the debt. That notice was to specify/notify Plaintiff of: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date that the notice was given, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Deed and the sale of the Property; (e) that Plaintiff had a right to reinstate after acceleration and had a right to bring a court action to assert the non-existence of a default or any other defense of Plaintiff to acceleration and sale.

71.

Pursuant to Section 22, CMI could only accelerate and invoke the power of sale after giving the aforementioned notice to Plaintiff. However, CMI never gave the aforementioned notice to Plaintiff.

72.

CMI's act of failing to give the aforementioned notice to Plaintiff constitutes breach of contract, as well as breach of the duty of good faith and fair dealing and breach of the duty to exercise the power of sale fairly and in good faith.

## CAUSATION & DAMAGES (FIRST CAUSE OF ACTION)

73.

As a direct and proximate result of the wrongful conduct of CMI, Wilmington & Pendergast, Plaintiff's home was foreclosed and sold.

74.

As a direct and proximate result of the conduct of CMI, Wilmington & Pendergast, Plaintiff suffered great mental anguish, concern, worry, and wounded feelings.

75.

As a direct and proximate result of the conduct of CMI, Wilmington & Pendergast, Plaintiff has suffered or will suffer pecuniary loss in the form of loss of home equity and loss of the value of the equity of redemption, as well as in connection with attorney's fees, expert fees and associated costs and expenses.

76.

As a direct and proximate result of the conduct of CMI, Wilmington & Pendergast, Plaintiff has suffered pecuniary loss in additional interest, fees, and

costs levied by Defendants.

77.

As a direct and proximate result of the conduct of CMI, Wilmington & Pendergast, Plaintiff has suffered a cloud on title.

78.

As a direct and proximate result of the conduct of CMI, Wilmington & Pendergast, Plaintiff is in danger of imminent dispossession.

79.

Plaintiff demands an award of compensatory damages in an amount that will be sufficient to compensate Plaintiff for the harm that he has suffered.

**Punitive Damages**

80.

The actions of CMI, Wilmington & Pendergast show an intent to cause harm and an entire want of care which would raise the presumption of conscious indifference to consequences.

81.

Plaintiff demands an award of punitive damages in an amount that will be sufficient to deter CMI, Wilmington & Pendergast from this conduct in the future.

**SECOND CAUSE OF ACTION: DECLARATORY JUDGMENT**
(As to all Defendants)

82.

27

This Cause of Action is brought pursuant to O.C.G.A. § 9-4-1 *et seq*.

83.

There is a real and justiciable controversy between the Plaintiff and all Defendants (the Parties) with regard to the ownership and enforcement of Plaintiff's Note obligation, as well as with regard to the Parties' respective interests in the Property.

84.

It is necessary and proper that the rights and status among the Parties hereto be declared.

85.

Particularly, the terms of the Trust Agreement are relevant to determining the rights and status among the Parties in and to the Note and the Property.

86.

Here, the Trust Agreement lays out very specific requirements for the delivery and acceptance of Notes and Mortgages (i.e. security deeds). (**Ex. "D"** pp. 55-61 (Art. II, §§ 2.01-2.02)). For example, there is to be a complete chain of endorsements on the note from the named payee (i.e. the original lender) to the trustee. In other words, there was to be an endorsement on the Note (or on an allonge attached to the Note) from the named payee (BancFinancial), an

endorsement from the seller/sponsor (LBH), and an endorsement from the depositor (SASC). (**Ex. "D"**, p. 57 (Art. II, § 2.01(b)(i))).

87.

Additionally, the original Security Deed was to be transferred into the Trust. (**Ex. "D"**, p. 57, 58 (Art. II, § 2.01(b)(iii), (viii))).

88.

Further, the Trustee was to be clearly identified as the owner of the Mortgage Loan in MERS's database. (**Ex. "D"**, p. 57, 59 (Art. II, § 2.01(c)(ii))).

89.

Moreover, the Trustee was to have a complete chain of assignments of the Security Deed in order to prove that the Trustee held title to the Property. (**Ex. "D"**, p. 58 (Art. II, § 2.01(b) (vi))).

90.

If any Mortgage File suffered from a material defect (i.e. missing or improperly assigned documents), the Trustee was required either (1) to force the Depositor (SASC) to cure the defect, or (2) to reject the Mortgage File and force the Depositor (SASC) to buy it back from the Trust. (**Ex. "D"**, p. 60-61 (Art. II, § 2.02(c)); see also pp. 64-65 (Art. II, § 2.05)). All of this was to occur not later than one hundred and thirty-five (135) days after the Trust closed. (**Ex. "D"**, p. 60 (Art. II, §§ 2.02(b), (c))).

91.

In the instant matter, title to the Property was transferred into the Trust more than eight years after it closed, and there was never an assignment of the Security Deed into the Trust.

92.

Thus, the Trustee had no power to retain Plaintiff's Note pursuant to the terms of the Trust Agreement (assuming *arguendo* that the Trust *ever* retained Plaintiff's Note). Additionally, the Trustee had no power to purchase Plaintiff's Property at foreclosure sale pursuant to the terms of the Trust Agreement.

93.

As both of these acts were in contravention of the Trust Agreement's terms, both were void as a matter of law. See New York Consolidated Law Service, Estates, Powers, and Trusts Law (NY CLS EPTL) § 7-2.4.

94.

Additionally, and pursuant to the same statute, the Trust never retained title over Plaintiff's Note because there was not a complete chain of endorsements pursuant to Art. II, § 2.01(b)(i) of the Trust Agreement. (**Ex. "D"**, p. 57).

95.

The Trust is a New York common law trust.

96.

New York law governs determinations regarding the powers of the Trustee and what constitutes Trust Property.

97.

The Note and the Security Deed were not transferred into the Trust pursuant to the Trust's terms.

98.

This invalid delivery meant that neither the Note nor the Security Deed ever became a part of the Trust corpus.

99.

Consequently, the Trustee was without power to take any actions with regard to the Property because it did not hold legal title to the Property.

100.

Additionally, the Trustee was without power to take any actions with regard to enforcement of the Note because it did not hold legal title to the Note.

101.

Plaintiff seeks a declaration of rights, including a declaration that the Trust, that Citibank as Trustee, and that Wilmington as Trustee never held a legally enforceable interest in the Property or in the Note, and consequently that all actions taken by the Trustees and their agents with regard to the Property and/or with regard to the enforcement of the Note are void.

102.

Plaintiff seeks a further declaration of rights that none of the Defendants hold any interest in either the Property or in the Note.

103.

There is no adequate remedy at law to restore Plaintiff to the *status quo ante*.

## THIRD AND FOURTH CAUSES OF ACTION: GEORGIA CIVIL RICO (O.C.G.A. §§ 16-14-1 *ET SEQ.*) AND FEDERAL CIVIL RICO (18 U.S.C. §§ 1961 *ET SEQ.*)

(As to Citibank as Trustee, Wilmington as Trustee, CMI, MERS, and Pendergast (collectively, the "RICO Defendants"))

## GEORGIA RICO STANDARDS

104.

Under O.C.G.A. § 16-14-4(a), "[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

105.

Under O.C.G.A. § 16-14-4(b), "[i]t is unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

106.

Under O.C.G.A. § 16-14-4(c), "[i]t is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of [O.C.G.A. O.C.G.A. § 16-14-4]."

107.

Pursuant to O.C.G.A. § 16-14-3(8), "'[p]attern of racketeering activity' means:

(A) Engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity[.]"

108.

Pursuant to O.C.G.A. § 16-14-3(9)(A),

"'[r]acketeering activity' means to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit any crime

33

which is chargeable by indictment under the following laws of this state:

…

(viii) Code Section 16-9-1, relating to forgery in any degree;

…

(xv) Article 4 of Chapter 10 of this title and Code Sections 16-10-20, 16-10-20.1, 16-10-23, and 16-10-91, relating to perjury and other falsifications;

…

(xxix) Any conduct defined as "racketeering activity" under 18 U.S.C. Section 1961 (1)(A), (B), (C), and (D);

…

(xxxvii) Code Section 33-1-9, relating to insurance fraud;

…[and]

(xl) Code Section 16-8-102, relating to residential mortgage fraud."

109.

Pursuant to O.C.G.A. § 16-9-1:

(b) A person commits the offense of forgery in the first degree when with the intent to defraud he or she knowingly makes, alters, or possesses any writing, other than a check, in a fictitious name or in

34

such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing.

(c) A person commits the offense of forgery in the second degree when with the intent to defraud he or she knowingly makes, alters, or possesses any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority.

110.

Pursuant to O.C.G.A. § 16-10-71 (contained within Title 16, Chapter 10, Article 4):

(a) A person to whom a lawful oath or affirmation has been administered or who executes a document knowing that it purports to be an acknowledgment of a lawful oath or affirmation commits the offense of false swearing when, in any matter or thing other than a judicial proceeding, he knowingly and willfully makes a false

statement.

111.

O.C.G.A. § 16-10-20 states that:

A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

112.

O.C.G.A. § 16-8-102 states that:

A person commits the offense of residential mortgage fraud when, with the intent to defraud, such person:

(1) Knowingly makes any deliberate misstatement,

misrepresentation, or omission during the mortgage lending process with the intention that it be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly uses or facilitates the use of any deliberate misstatement, misrepresentation, or omission, knowing the same to contain a misstatement, misrepresentation, or omission, during the mortgage lending process with the intention that it be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Receives any proceeds or any other funds in connection with a residential mortgage closing that such person knew resulted from a violation of paragraph (1) or (2) of this Code section;

(4) Conspires to violate any of the provisions of paragraph (1), (2), or (3) of this Code section; or

(5) Files or causes to be filed with the official registrar of deeds of any county of this state any document such person knows to contain a deliberate misstatement, misrepresentation, or omission.

(Amended by 12 HB 237 to include the execution of deeds under power).

113.

O.C.G.A. § 33-1-9 enumerates the actions constituting insurance fraud.

## FEDERAL RICO STANDARDS

114.

18 U.S.C. § 1962 states as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 U.S.C. § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with

any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

115.

18 U.S.C. § 1961 states as follows:

As used in this chapter [18 U.S.C. §§ 1961 et seq.]--

(1) "racketeering activity" means …

(B) any act which is indictable under any of the following provisions of title 18, United States Code: section 1341 [18 U.S.C. § 1341] (relating to mail fraud), section 1343 [18 U.S.C. § 1343] (relating to wire fraud)…

116.

18 U.S.C. § 1343 states as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

117.

18 U.S.C. § 1341 states as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly

causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

### 118.

With regard to GA RICO, Citibank as Trustee, Wilmington as Trustee, CMI, MERS, and Pendergast have acquired and maintained interest in and control of real property and money through a pattern of racketeering activity (O.C.G.A. § 16-14-4(a)). Additionally the RICO Defendants are either employed by or associated with an enterprise (the Trust) and have conducted or participated I such enterprise through a pattern of racketeering activity (O.C.G.A. § 16-14-4(b)). Finally, the RICO Defendants have conspired or endeavored to violate O.C.G.A. § 16-14-4(a), (b).

### 119.

With regard to GA RICO, the RICO Defendants have engaged in at least two acts of "racketeering activity" (as defined by O.C.G.A. § 16-14-3(9)(A)) in furtherance of a scheme with the same intents, accomplices, victim (the Plaintiff) and methods of commission and that are interrelated by distinguishing characteristics (i.e. they all involve the foreclosure of the Property and the effort to hide the identity of the Note owner from the Plaintiff).

41

120.

With regard to Federal RICO, the RICO Defendants, all acting as principals under 18 USC § 2, have received income derived from a pattern of racketeering activity and through collection of an unlawful debt; and have to used the income or the proceeds of the income or have invested part of such income in the operation of, enterprises that engage in or that affect interstate or foreign commerce.

121.

Additionally, with regard to Federal RICO, the RICO Defendants, all acting as principals under 18 USC § 2, have maintained, through a pattern of racketeering activity and through collection of an unlawful debt, an interest in or control of an enterprise (i.e. the business of the Trust) which is engaged in, or the activities of which affect, interstate or foreign commerce.

122.

Finally, with regard to Federal RICO, the RICO Defendants, all acting as principals under 18 USC § 2, and as associated with the business of the Trust, have conducted or participated, in the conduct of the Trust's affairs through a pattern of racketeering activity or collection of unlawful debt, and have conspired to violate one or more of the provisions of subsection (a), (b), or (c) of 18 U.S.C. § 1962.

123.

The RICO Defendants devised a scheme for obtaining legal title to Plaintiff's Property, Plaintiff's equity of redemption, the liquidation value of Plaintiff's Property, the proceeds of any insurance policies associated with Plaintiff's Property, and servicing/legal fees by false or fraudulent pretenses, representations, or promises; and accomplished this scheme by virtue of the predicate acts stated below.

**Predicate Act 1: Misrepresentation/Suppression Regarding the Identity of the Note Holder through Mail or Wire Communications**

124.

CMI, at the direction of Citibank and Wilmington, willfully misrepresented and suppressed the identity of the Note owner. CMI did this through mail, email, and phone communications. These actions violated O.C.G.A. §§ 23-2-52, 23-2-53; 18 U.S.C. §§ 1341, 1343. Citibank and Wilmington directed CMI to do this for the purpose of preventing Plaintiff from discovering the improprieties involved in the pooling of his Note and Security Deed, which would give Plaintiff grounds to challenge the Trust's right to his Note and Security Deed and would result in possible financial loss to the Trust.

**Predicate Acts 2, 3, 4, 5, 6, 7, 8, 9, 10 &11: Preparing, Transmitting (by Mail or Wire), Executing, Re-Transmitting, and Recording Two Documents (the Assignment and the Deed Under Power) that Contained False, Fictitious, or Fraudulent Representations or Statements**

125.

As described in Paragraphs 59-65, *supra*, the both the Assignment and the DUP contain and/or are predicated upon false, fictitious, and fraudulent representations and statements. For example:

(1) Aaron Menne and Jaime Hardcastle falsely affirm that they are vice presidents of MERS when they are not in fact (a violation of O.C.G.A. §§ 16-10-20, 16-8-102(5), 16-10-71(a), 23-2-51, 23-2-52, 23-2-53, and 23-2-54);

(2) the Assignment twice purports to transfer the Note to CMI when it does not in fact and when there was absolutely no intention to transfer title to the Note to CMI (a violation of O.C.G.A. §§ 16-10-20, 16-8-102(5), 16-10-71(a), 23-2-51, 23-2-52, 23-2-53, and 23-2-54);

(3) the Assignment falsely purports to be signed in Franklin County, MO, when it was actually signed in St. Charles County, MO (a violation of O.C.G.A. §§ 16-10-20, 16-8-102(5), 16-10-71(a), 23-2-51, 23-2-52, 23-2-53, and 23-2-54); and

(4) Both the DUP and the Assignment are falsely and fraudulently attested, as the Unofficial Witnesses and/or the Notaries Public did not witness the executions of both signatories (a violation of O.C.G.A. §§ 16-10-71(a), 16-10-20, 16-8-102(2), (4), (5)).

126.

44

The RICO Defendants specifically conspired for these false statements to be made in these documents for the explicit purpose of making it as easy as possible for CMI to foreclose on the Property. All of the RICO Defendants benefitted monetarily from the foreclosure of the Property in the form of insurance fees, legal fees, servicing fees, etc.

127.

The preparation of each document by Pendergast constitutes two predicate acts under O.C.G.A. §§ 16-10-20, 16-8-102(2), (4), (5)). The transmittal of each document from Pendergast to CMI constitutes two predicate acts under 18 U.S.C. §§ 1343 or 1341 (which are predicate acts under both Federal and GA RICO). The execution of each document by CMI constitutes two predicate acts under O.C.G.A. §§ 16-9-1(a), (b); 16-10-20; 16-10-71(a); 16-8-102(2), (4), (5)). The re-transmittal from CMI to Pendergast of each document constitutes two predicate acts under 18 U.S.C. §§ 1343 or 1341 (which are predicate acts under both Federal and GA RICO). Finally, the recording of each document constitutes two predicate acts under O.C.G.A. §§ 16-10-20; 16-8-102(2), (4), (5)).

128.

Pursuant to O.C.G.A. §§ 16-14-6(a)(1)-(2), (c) and 16-14-9, as well as 18 U.S.C. § 1964(c), Plaintiff is entitled to injunctive relief, three times his actual damages sustained (as set forth in Paragraphs 73-79, *supra*), punitive damages (as

described in Paragraphs 80-81, *supra*), attorney fees, and investigation and litigation costs.

## FIFTH CAUSE OF ACTION: FAIR DEBT COLLECTION PRACTICES ACT VIOLATION (15 U.S.C. 1692 *ET SEQ.*)
(Against Pendergast)

129.

Pendergast is a debt collector for purposes of the FDCPA.

130.

Pendergast's act of sending Plaintiff a Notices of Sale constituted "debt collection activity" under the FDCPA.

131.

Pendergast's Notice of Sale did not include the name of the secured creditor. This made the Notice of Sale deceptive and misleading.

132.

Pendergast's Notice of Sale stated that CMI was the entity with full authority to amend and modify the debt. This made the Notice of Sale False, Deceptive, and Misleading.

133.

Pendergast's Notice of Sale did not contain the name of the creditor to whom the debt is owed.

**FDCPA Violation #1 (GA/Federal RICO Predicate Act 12)**

134.

Pendergast's act of not including the name of the secured creditor on the Notice of Sale violated 15 U.S.C. § 1692g(a)(2). This act also violated 15 U.S.C. § 1692e, 1692e(10) because is it false, deceptive, and misleading. It also constituted a GA and Federal RICO predicate act because the representation was made by mail or wire.

**Violation #2 (GA/Federal RICO Predicate Act 13)**

135.

Pendergast's act of identifying CMI as the entity with full authority to amend and modify the debt violated 15 U.S.C. § 1692e, 1692e(10) because is it false, deceptive, and misleading. It also constituted a GA and Federal RICO predicate act because the representation was made by mail or wire.

136.

Plaintiff is entitled to an award of actual damages as described in Paragraphs Paragraphs 73-79, *supra*), as well as attorney fees and litigation costs.

**PETITION FOR EQUITABLE RELIEF**

137.

Plaintiff incorporates by reference the within and foregoing Paragraphs 1-136 of his Complaint as if fully restated herein.

138.

47

No adequate remedy at law is available to Plaintiff as a result of CMI's Citibank's Wilmington's MERS's, and Pendergast's wrongful conduct.

### 139.

Wilmington's threat to take possession of Plaintiff's Property is imminent and the injury to Plaintiff would be irreparable.

### 140.

Plaintiff requests an injunction permanently enjoining Wilmington and all other Defendants and their successors, assigns, and heirs from taking any action to take possession of Plaintiff's Property or foreclose again in the future.

### 141.

Plaintiff requests that the foreclosure sale of Plaintiff's Property be set aside and that the DUP and the Assignment be cancelled.

**WHEREFORE, Plaintiff prays for relief as follows:**

(1) For a trial by jury (as legally permitted);

(2) An award in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including:

    a. Three times Plaintiff's actual damages;

    b. Punitive damages;

    c. Attorney's fees and costs;

d.  Prejudgment interest at the maximum legal rate; and

e.  For equitable relief consisting of the setting aside of the
    foreclosure, the cancellation of the Assignment and the Deed
    Under Power, and an injunction permanently enjoining all
    Defendants and their successors, assigns, and heirs from taking any
    action to take possession of Plaintiff's Property or foreclose again
    in the future.

Respectfully submitted this 3rd day of January, 2013.

_[s] William J. Smith_____

William J. Smith
Georgia Bar No. 710280
ATTORNEY FOR PLAINTIFF
DARRYL GATLIN

2202 Dunwoody Gables Dr.
Dunwoody, GA 30338
Telephone: (770) 601-9085
Facsimile: (404) 816-6856
bjsmith3414@gmail.com

49

## FONT AND POINT CERTIFICATION

The undersigned counsel for Plaintiff hereby certify that the within and foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT & PETITION FOR EQUITABLE RELIEF** was prepared using Times New Roman, 14-point font in accordance with LR 5.1(B).

This the 3rd day of January, 2013.

_[s] William J. Smith_____
William J. Smith
Georgia Bar No. 710280
ATTORNEY FOR PLAINTIFF
DARRYL GATLIN

2202 Dunwoody Gables Dr.
Dunwoody, GA 30338
Telephone: (770) 601-9085
Facsimile: (404) 816-6856
bjsmith3414@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this 3rd day of January, 2013, served all parties in this matter with the foregoing **PLAINTIFF'S FIRST AMENDED COMPLAINT & PETITION FOR EQUITABLE RELIEF** by the following methods:

(1) I certify that I have served Defendants that are already parties to this Action by CM/ECF pursuant to 5.1(A)(3).

(2) I further certify that I have served the Defendants that have been added as parties to this Action pursuant to Rule 4 at the following addresses:

Pendergast & Associates, P.C.
c/o John F. Pendergast, Jr.
115 Perimeter Center Place, Suite 1000
Atlanta, GA 30346

Structured Asset Securities Corporation Mortgage Pass-Through Certificates,
Series 2003-36XS
c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, DE 19890

Aurora Loan Services, Inc. nka Aurora Loan Servicing, LLC
c/o Corporation Service Company
40 Technology Parkway South, Suite 300
Norcross, GA 30092

Lehman Brothers Holdings, Inc.
c/o Corporation Service Company
2711 Centerville Road, Suite 400

Wilmington, DE 19808

Structured Asset Securities Corporation
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

Mortgage Electronic Registration Systems, Inc.
c/o William (Bill) Beckmann, President & CEO
1818 Library Street, Suite 300
Reston, VA 20190

MBIA Insurance Corporation
c/o Gary C. Dunton, CEO
113 King Street
Armonk, NY 10504

Suntrust Bank sbm National Bank of Commerce
c/o Raymond D. Fortin
c/o Hasana R. Kelly
303 Peachtree Street N.E., Suite 3600
Atlanta, GA 30308

_[s] William J. Smith_____
William J. Smith
Georgia Bar No. 710280
ATTORNEY FOR PLAINTIFF
DARRYL GATLIN

2202 Dunwoody Gables Dr.
Dunwoody, GA 30338
Telephone: (770) 601-9085
Facsimile: (404) 816-6856
bjsmith3414@gmail.com